1  Adam M. Apton (State Bar No. 316506)
   Email: aapton@zlk.com
2  **LEVI & KORSINSKY LLP**
3  388 Market Street, Suite 1300
   San Francisco, CA 94111
4  Telephone: 415-373-1671
   Facsimile: 212-363-7171
5
6  Nicolas I. Porritt (*pro hac vice* to be filed)
   Email: nporritt@zlk.com
7  **LEVI & KORSINSKY LLP**
   1101 30th Street NW, Suite 115
8  Washington, D.C. 20007
   Tel : 202-524-4290
9
   *Attorneys for Individual and Representative*
10 *Plaintiff Phillip Lam*

11
                    **UNITED STATES DISTRICT COURT**
12                  **NORTHERN DISTRICT OF CALIFORNIA**

13  PHILLIP LAM, on behalf of himself          Case No.
14  and all others similarly situated,
                                               **COMPLAINT FOR VIOLATION OF**
15              Plaintiffs,                     **FEDERAL SECURITIES LAW**

16        vs.

17  CONTEXTLOGIC, INC., PETER
    SZULCZEWSKI, RAJAT BAHRI, BRETT JUST,
18  JULIE BRADLEY, ARI MANUEL,
    JOE LONSDALE, TANZEEN SYED,
19  STEPHANIE TILENIUS, HANS TUNG,
    JACQUELINE RESES, GOLDMAN SACHS &
20  CO. LLC, J.P. MORGAN SECURITIES LLC,
    BOFA SECURITIES, INC., CITIGROUP
21  GLOBAL MARKETS INC., DEUTSCHE BANK
    SECURITIES INC., UBS SECURITIES LLC, RBC
22  CAPITAL MARKETS, LLC, CREDIT SUISSE
    SECURITIES (USA) LLC, COWEN AND
23  COMPANY, LLC, OPPENHEIMER & CO. INC.,
    STIFEL, NICOLAUS & COMPANY, L.L.C.,
24  ACADEMY SECURITIES, INC., LOOP
    CAPITAL MARKETS LLC, and R. SEELAUS &
25  CO., LLC.,
26              Defendants.
27

                COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Plaintiff Phillip Lam ("Plaintiff") alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by ContextLogic, Inc. ("ContextLogic" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of: (i) all persons or entities who purchased or otherwise acquired securities of ContextLogic., and/or sold put options of ContextLogic during the period from December 16, 2020 and May 12, 2021, inclusive; and/or (ii) all persons who purchased ContextLogic securities pursuant and/or traceable to the Company's initial public offering conducted on or about December 16, 2020, both dates inclusive, seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     ContextLogic operates as a mobile ecommerce company in Europe, North America, South America, and internationally. The Company operates the Wish platform that connects users to merchants and also provides marketplace and logistics services to merchants. The Company also generates fees by offering advertising and logistics services to its merchants, and Wish claims to have a user base of 100 million monthly active users ("MAUs") and 500,000 merchants.

3.     On November 20, 2020, ContextLogic filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after an amendment, was declared effective by the SEC on December 15, 2020 (the "Registration Statement").

4.     On December 16, 2020, pursuant to the Registration Statement, ContextLogic's securities began trading on the NASDAQ Global Market ("NASDAQ") under the symbol "WISH." On December 17, 2020, ContextLogic filed a prospectus on Form 424B4 with the SEC in connection with the IPO which incorporated and formed part of the Registration Statement (collectively, the "Offering

Documents").

5. Pursuant to the Offering Documents, ContextLogic issued 46 million of its shares to the public at the Offering price of $24.00 per share for approximate proceeds of $1.1 billion.

6. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) ContextLogic's Q4 2020 MAUs had declined materially and were not then growing; (ii) accordingly, ContextLogic had materially overstated the Company's business metrics and financial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7. On March 8, 2021, ContextLogic announced its Q4 2020 financial results. In a press release, the Company stated that, during Q4 2020 its MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily deemphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year."

8. On this news, ContextLogic's stock price fell $1.83 per share, or 10%, to close at $15.94 per share on March 8, 2021.

9. Then, on May 12, 2021, ContextLogic announced its Q1 2021 financial results. The Company disclosed that its MAUs had declined another 7% to just 101 million. In addition, the Company's forward sales guidance also fell short, with its Q2 2021 revenue guidance of just $715 million to $730 million representing a significant departure from the $759 million the market had been led to expect and far less than the guidance of $735 to $750 million provided for Q1 2021.

10. On this news, ContextLogic's stock price fell $3.36 per share, or 29%, to close at $8.11 per share on May 13, 2021.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

11.    As of the time this Complaint was filed, the price of ContextLogic securities continues to trade below the Offering price, damaging investors. 12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of ContextLogic's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

12.    The federal law claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 5 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act, 15 U.S.C. §77v and/or §27 of the Exchange Act, 15 U.S.C §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, and interstate telephone communications.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 22 of the Securities Act because the false and misleading statements at issue took place and had an effect in this District.

**PARTIES**

**A.  Plaintiff**

15.    Plaintiff Phillip Lam purchased ContextLogic securities as set forth herein and in his certification filed herewith.

**B.  Defendants**

**The Company**

16.    Defendant ContextLogic is a San Francisco, California-based global ecommerce provider, incorporated under the law of the state of Delaware. ContextLogic maintains its headquarters at One Sansome Street, 40th Floor, San Francisco, CA 94104, and its common stock is listed on the NASDAQ under the ticker symbol "WISH."

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

**The Individual Defendants**

*The Officer Defendants*

17. Defendant Peter Szulczewski ("Szulczewski") was, throughout the Class Period and at all relevant times, Founder, CEO and Chairperson of the Board of Directors (the "Board"). Defendant Szulczewski reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CEO.

18. Defendant Rajat Bahri ("Bahri") was, throughout the Class Period and at all relevant times, ContextLogic's CFO. Defendant Bahri reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CFO.

19. Defendant Szulczewski and Bahri are collectively referred to herein as the "Officers Defendants."

20. Each of the Officers Defendants:

    a. directly participated in the management of the Company;

    b. was directly involved in the day-to-day operations of the Company at the highest levels;

    c. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    d. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    e. was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    f. approved or ratified these statements in violation of the federal securities laws.

21. Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about ContextLogic's business, operations, operational trends, financial

statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

### *The IPO Defendants*

22.     Defendant Brett Just ("Just") was, throughout the Class Period and at all relevant times, ContextLogic's Chief Accounting Officer ("CAO"). Defendant Just reviewed, approved, and participated in making statements in the Registration Statement, which he signed. He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as ContextLogic's CAO.

23.     At all relevant times, Defendant Julie Bradley ("Bradley") served as a director on the Board. Defendant Bradley participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

24.     At all relevant times, Defendant Ari Emanuel ("Emanuel") served as a director on the Board. Defendant Emanuel participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

25.     At all relevant times, Defendant Joe Lonsdale ("Lonsdale") served as a director on the Board. Defendant Lonsdale participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

26.     At all relevant times, Defendant Tanzeen Syed ("Syed") served as a director on the Board. Defendant Syed participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

27.     At all relevant times, Defendant Stephanie Tilenius ("Tilenius") served as a director on the Board. Defendant Tilenius participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

28.     At all relevant times, Defendant Hans Tung ("Tung") served as a director on the Board. Defendant Tung participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

29.     Defendant Jacqueline Reses ("Reses") was identified as an incoming director in the Registration Statement and was named a member of the Board on December 18, 2020 and was made Chairperson of the Board on May 12, 2021.

30.     Defendants Just, Bradley, Emanuel, Lonsdale, Syed, Tilenius, Reses, and Tung are collectively referred to herein as the "IPO Defendants."

31.     The Officers Defendants and the IPO Defendants are sometimes collectively referred to herein as the "Individual Defendants."

32.     The Offering Documents, including the documents it incorporated by reference, contained materially untrue and misleading statements and/or omissions. Defendants negligently allowed the Offering Documents to contain materially untrue and misleading statements and/or omissions to the extent that they knew or should have known that the Offering Documents were materially misleading but failed to act in a reasonable manner to prevent the Offering Documents from containing materially misleading statements and/or preventing the materially misleading Offering Documents from being disseminated. These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent Defendants' investigation into the true facts. These claims are not based on any allegation of fraud, intentional wrongdoing, or severe recklessness.

*The Underwriter Defendants*

33.     The Underwriter Defendants were also instrumental in soliciting investors and in making the ContextLogic shares that were offered and sold in or traceable to the IPO available to the members of the Securities Act Class. The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold to the Securities Act Class members in the IPO:

| Underwriters | Number of Shares |
| --- | --- |

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

| | |
|---|---|
| Goldman Sachs & Co. LLC | 16,169,000 |
| J.P. Morgan Securities LLC | 11,615,000 |
| BofA Securities, Inc. | 7,015,000 |
| Citigroup Global Markets Inc. | 1,932,000 |
| Deutsche Bank Securities Inc. | 1,932,000 |
| UBS Securities LLC | 1,932,000 |
| RBC Capital Markets, LLC | 1,840,000 |
| Credit Suisse Securities (USA) LLC | 1,380,000 |
| Cowen and Company, LLC | 460,000 |
| Oppenheimer & Co. Inc. | 460,000 |
| Stifel, Nicolaus & Company, Incorporated | 460,000 |
| William Blair & Company, L.L.C. | 460,000 |
| Academy Securities, Inc. | 115,000 |
| Loop Capital Markets LLC | 115,000 |
| R. Seelaus & Co., LLC | 115,000 |
| Total | 46,000,000 |

34.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials. Goldman Sachs acted as a representative of all the underwriters. Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses. Goldman Sachs' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant Goldman Sachs conducts business in this District.

35.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials. J.P. Morgan acted as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses. J.P. Morgan's participation in and its

1  solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant J.P.

2  Morgan conducts business in this District.

3      36.    Defendant BofA Securities, Inc. ("BofA") was an underwriter of the Company's IPO,

4  serving as a financial advisor for and assisting in the preparation and dissemination of the Company's

5  material inaccurate, misleading, and incomplete Offering Materials. BofA acted as a representative of all

6  the underwriters. BofA also participated in conducting and promoting the roadshow for the IPO and paying

7  for the expenses of the Director Defendants who participated in the roadshow, including lodging and

8  travel, among other expenses. BofA's participation in and its solicitation of offers in connection with the

9  IPO was motivated by its financial interests. Defendant BofA conducts business in this District.

10     37.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the

11 Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

12 the Company's material inaccurate, misleading, and incomplete Offering Materials. Citigroup participated

13 in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director

14 Defendants who participated in the roadshow, including lodging and travel, among other expenses.

15 Citigroup's participation in and its solicitation of offers in connection with the IPO was motivated by its

16 financial interests. Defendant Citigroup conducts business in this District.

17     38.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the

18 Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

19 the Company's material inaccurate, misleading, and incomplete Offering Materials. Deutsche Bank

20 participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

21 Director Defendants who participated in the roadshow, including lodging and travel, among other

22 expenses. Deutsche Bank's participation in and its solicitation of offers in connection with the IPO was

23 motivated by its financial interests. Defendant Deutsche Bank conducts business in this District.

24     39.    Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's IPO,

25 serving as a financial advisor for and assisting in the preparation and dissemination of the Company's

26 material inaccurate, misleading, and incomplete Offering Materials. UBS participated in conducting and

27 promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who

1  participated in the roadshow, including lodging and travel, among other expenses. UBS's participation in

2  and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant

3  UBS conducts business in this District.

4      40.    Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the Company's IPO,

5  serving as a financial advisor for and assisting in the preparation and dissemination of the Company's

6  material inaccurate, misleading, and incomplete Offering Materials. RBC participated in conducting and

7  promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who

8  participated in the roadshow, including lodging and travel, among other expenses. RBC's participation in

9  and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant

10  RBC conducts business in this District.

11      41.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of

12  the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination

13  of the Company's material inaccurate, misleading, and incomplete Offering Materials. Credit Suisse

14  participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

15  Director Defendants who participated in the roadshow, including lodging and travel, among other

16  expenses. Credit Suisse's participation in and its solicitation of offers in connection with the IPO was

17  motivated by its financial interests. Defendant Credit Suisse conducts business in this District.

18      42.    Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's

19  IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's

20  material inaccurate, misleading, and incomplete Offering Materials. Cowen participated in conducting and

21  promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who

22  participated in the roadshow, including lodging and travel, among other expenses. Cowen's participation

23  in and its solicitation of offers in connection with the IPO was motivated by its financial interests.

24  Defendant Cowen conducts business in this District.

25      43.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter of the

26  Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

27  the Company's material inaccurate, misleading, and incomplete Offering Materials. Oppenheimer

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

1    participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the
2    Director Defendants who participated in the roadshow, including lodging and travel, among other
3    expenses. Oppenheimer's participation in and its solicitation of offers in connection with the IPO was
4    motivated by its financial interests. Defendant Oppenheimer conducts business in this District.

5         44.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the
6    Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of
7    the Company's material inaccurate, misleading, and incomplete Offering Materials. Stifel participated in
8    conducting and promoting the roadshow for the IPO and paying for the expenses of the Director
9    Defendants who participated in the roadshow, including lodging and travel, among other expenses. Stifel's
10   participation in and its solicitation of offers in connection with the IPO was motivated by its financial
11   interests. Defendant Stifel conducts business in this District.

12        45.    Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the
13   Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of
14   the Company's material inaccurate, misleading, and incomplete Offering Materials. William Blair
15   participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the
16   Director Defendants who participated in the roadshow, including lodging and travel, among other
17   expenses. William Blair's participation in and its solicitation of offers in connection with the IPO was
18   motivated by its financial interests. Defendant William Blair conducts business in this District.

19        46.    Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the
20   Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of
21   the Company's material inaccurate, misleading, and incomplete Offering Materials. Academy Securities
22   participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the
23   Director Defendants who participated in the roadshow, including lodging and travel, among other
24   expenses. Academy Securities' participation in and its solicitation of offers in connection with the IPO
25   was motivated by its financial interests. Defendant Academy Securities conducts business in this District.

26        47.    Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the
27   Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

the Company's material inaccurate, misleading, and incomplete Offering Materials. Loop Capital participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses. Loop Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant Loop Capital conducts business in this District. 44. Defendant R. Seelaus & Co., LLC ("R. Seelaus") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Materials. R. Seelaus participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Director Defendants who participated in the roadshow, including lodging and travel, among other expenses. R. Seelaus' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant R. Seelaus conducts business in this District.

48. Defendants listed in ¶¶33-46 are collectively referred to herein as the "Underwriter Defendants."

49. Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Materials. In addition, although not an element of Plaintiff's claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

50. Each Underwriter Defendant named herein is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

51. As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the

Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

52.    Representatives of the Underwriter Defendants also assisted ContextLogic and the Director Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

53.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to ContextLogic's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which ContextLogic's common stock would be sold; (iii) the language to be used in the Offering Materials; (iv) what disclosures about ContextLogic would be made in the Offering Materials; and (v) what responses would be made to the SEC in connection with its review of the Offering Materials. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and ContextLogic's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of ContextLogic's undisclosed then-existing problems and plans and the Offering Materials' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

54.    The Underwriter Defendants also demanded and obtained an agreement from ContextLogic under which ContextLogic agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

55.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Director Defendants, could offer to sell, and sell, ContextLogic shares to Plaintiff and the members of the Securities Act Class pursuant (or traceable) to the Offering Materials.

**CONTROL PERSON ALLEGATIONS**

56.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of ContextLogic's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

**Background**

57.     ContextLogic operates as a mobile ecommerce company in Europe, North America, South America, and internationally. The Company operates the Wish platform that connects users to merchants and also provides marketplace and logistics services to merchants. The Company also generates fees by offering advertising and logistics services to its merchants, and Wish claims to have a user base of 100 million MAUs and 500,000 merchants.

58.     On November 20, 2020, ContextLogic filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after an amendment, was declared effective by the SEC on December 15, 2020.

59.     On December 16, 2020, pursuant to the Registration Statement, ContextLogic's securities began trading on the NASDAQ under the symbol "WISH." On December 17, 2020, ContextLogic filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

60.     Pursuant to the Offering Documents, ContextLogic issued 46 million of its shares to the

public at the Offering price of $24.00 per share for approximate proceeds of $1.1 billion.

**Materially False and Misleading Statements Issued in the Offering Documents**

61.   The Offering Documents touted the Company's financial model, stating, in relevant part:

Our business benefits from powerful network effects, fueled by our data advantage and massive scale. As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. As more merchants succeed on Wish, more merchants join the platform and grow their businesses with Wish, broadening our product selection, which in turn improves user experience. By developing a strategy focused on users and merchants, we align user and merchant success with the success of our financial model. The growth in users and merchants generates more data, further strengthens our data advantage and creates an even better experience for everyone on our platform, in turn attracting more users and high-quality merchants. Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform. The following are key elements of our financial model that drive our growth: • Increase the scale and growth of our user and buyer base. Attracting and engaging users have been our key areas of focus since our founding. We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020, as well as the average minutes spent per visit by user. These increases have primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns. This growth has contributed to making Wish the most downloaded global shopping app for each of the last three years according to a report from Sensor Tower.17 As a result, we have experienced significant revenue growth in recent periods. We will need to continue to invest in our marketing efforts to attract additional users and buyers and to enhance our brand and drive user engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

62.   The Offering Documents also touted the impact of MAUs on the Company's business,

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

stating, in relevant part:

> We have become one of the largest and fastest growing global ecommerce platforms, connecting more than 100 million monthly active users ("MAUs" or "monthly active users") in over 100 countries to over 500,000 merchants offering approximately 150 million items. Our platform combines technology and data science capabilities, an innovative and discovery-based mobile shopping experience, a comprehensive suite of indispensable merchant services, and a massive scale of users, merchants, and items.
>
> ***
>
> Our scale, combined with our extensive data science capabilities, provides us with a unique competitive advantage and is core to our business operations. We collect, analyze, and utilize data across over 100 million monthly active users, over 500,000 merchants, and approximately 1.8 million items sold per day to improve the shopping experience for users and the selling experience for merchants. Our proprietary algorithms analyze a rich and growing data set of transactions and historical behaviors of both users and merchants to drive continuous optimization on the platform and inform key business decisions on a daily basis. Our data science enables personalization at the individual user level at a massive scale and drives significant advantages across all aspects of our business operations, including user acquisition, user experience, pricing strategies, usergenerated content, merchant insights, and user and merchant support. For example, our user acquisition strategies utilize our data science capabilities to make decisions on what to show to whom, when, and through which acquisition channel, with a focus on maximizing our return on marketing investment and user conversion. We also leverage our data and unique insights to extend our platform outside of our core business and drive additional growth opportunities, including new services to merchants and new categories for users

63.   In addition, the Offering Documents touted the Company's Wish platform, stating, in relevant part:

> Our global ecommerce platform connects over 100 million monthly active users in over 100 countries to over 500,000 global merchants. We seek to democratize ecommerce by making the Wish platform affordable, open, and accessible to all users and merchants worldwide. We do this through our relentless focus on product, technology, and data science. For our users, we

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

are revolutionizing the mobile shopping experience by making it affordable, personalized, and entertaining. For our merchants, we offer immediate, cost-efficient access to our global user base, scaled data, and technology platform, as well as a comprehensive suite of indispensable services to help run their businesses and drive sales. To serve our global and diversified user and merchant base, we approach our platform development with a specific geographic focus, tailoring key features to solve for the needs of that locality, and enabling an authentic, localized experience.

64.     Finally, the Offering Documents also discussed acquiring new users as part of the Company's growth strategy, stating, in relevant part:

> **Grow Our Base of Users**
> • **Continue to Acquire New Users**. We are focused on growing our user base around the world. We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India.
> • **Drive User Conversion.** We have over 12 million monthly active buyers13 and over 100 million monthly active users on the platform. We will continue to drive greater user engagement and convert more active users on our platform to become active buyers by utilizing our data science and introducing more interactive and entertaining features.
> • **Drive Profitable Lifetime Value from Existing Users**. We plan to continue to improve the engagement and monetization of our users on our platform to maximize their lifetime value. We plan to achieve this goal by: o Using our data science to drive personalization of our platform; o Continuing to offer attractive discounts and value, an entertaining user experience, and robust user-generated content; and o Improving our ease of use by investing in our user support and logistics infrastructure to enable faster deliveries and localization of our platform. • Expand Geographically. We intend to continue to expand our global footprint and enter new geographies and acquire new users in those markets.

65.     The statements in paragraphs ¶61-¶64 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) ContextLogic's Q4 2020 MAUs had declined materially and were not then growing; (ii) accordingly, ContextLogic had materially overstated the Company's business metrics and financial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

66.     Additionally, Defendants violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations." In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of the IPO Registration Statement, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered." Defendants' failure to disclose the information in ¶61-¶64 violated Item 303 and Item 105, because these adverse facts, trends, and uncertainties were known to Defendants and involved some of the most significant factors impacting the risk profile of ContextLogic securities and were likely to, and did, have a material adverse impact on ContextLogic's sales, revenues, and income from continuing operations.

**Materially False and Misleading Statements Issued During the Class Period**

67.     The Class Period begins on December 16, 2020, when ContextLogic's securities began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents.

68.     On March 8, 2021, ContextLogic issued a press release announcing the Company's Q4 and full year 2020 financial results. The press release listed as two of the Company's business highlights, "[f]or the full year 2020, Monthly Active Users (MAUs) increased 19% YoY to more than 107 million[]" and "MAUs declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where Wish temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year."

69.     On March 25, 2021, ContextLogic filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K"). In discussing the Company's Wish platform, the 2020 10-K stated, in relevant part:

> We also built Wish to empower merchants around the world. Today, most of our merchants are based in China. We initially grew our platform

focusing on merchants in China due to these merchants' strength in selling quality products at competitive prices. We continue to expand our merchant base around the world. Through our diversified and global merchant base, we are able to offer greater depth and breadth of categories and products. We give our merchants immediate access to our global base of over 100 million monthly active users and a comprehensive suite of indispensable services, including demand generation and engagement, user-generated content creation, data intelligence, promotional and logistics capabilities, and business operations support, all in a cost-efficient manner.

\*\*\*

Our global ecommerce platform connects over 100 million monthly active users in over 100 countries to over 550,000 global merchants. We seek to democratize ecommerce by making the Wish platform affordable, open, and accessible to all users and merchants worldwide. We do this through our relentless focus on product, technology, and data science. For our users, we are revolutionizing the mobile shopping experience by making it affordable, personalized, and entertaining. For our merchants, we offer immediate, cost-efficient access to our global user base, scaled data, and technology platform, as well as a comprehensive suite of indispensable services to help run their businesses and drive sales. To serve our global and diversified user and merchant base, we approach our platform development with a specific geographic focus, tailoring key features to solve for the needs of that locality, and enabling an authentic, localized experience.

70.     Further, in discussing the Company's financial model, the 2020 10-K stated, in relevant part:

Our business benefits from powerful network effects, fueled by our data advantage and massive scale. As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. As more merchants succeed on Wish, more merchants join the platform and grow their businesses with Wish, broadening our product selection, which in turn improves user experience. By developing a strategy focused on users and merchants, we align user and merchant success with the success of our financial model. The growth in users and merchants generates more data, further strengthens our data advantage and creates an even better experience for everyone on our platform, in turn attracting more users and high-quality merchants.

Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform.

The following are key elements of our financial model that drive our growth:

• **Increase the scale and growth of our user and buyer base.** Attracting and engaging users have been our key areas of focus since our founding. We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 19% from the year ended December 31, 2019 to the year ended December 31, 2020. This increase has

primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns. As a result, we have experienced significant revenue growth in recent periods. We will need to continue to invest in our marketing efforts to attract additional users and buyers and to enhance our brand and drive user engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

71.    The statements referenced in ¶¶ 68-70, *supra*, were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) ContextLogic's Q4 2020 MAUs had declined materially and were not then growing; (ii) accordingly, ContextLogic had materially overstated the Company's business metrics and financial prospects; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

72.    On January 14, 2021, the Company's slowing growth and fulfillment issues were featured in an article published on Investorplace.com entitled "With Slowing Growth and Mounting Losses, Give ContextLogic a Pass." On this news, ContextLogic's stock declined nearly 11.7%, falling from $28.13 per share on January 14, 2021 to close at $24.84 per share on January 15, 2021.

73.    Then, on March 8, 2021, ContextLogic reported its 4Q20 and FY20 financial results for the period ended December 31, 2020, disclosing that, by the time of its December 2020 IPO, its MAUs had already "declined 10% YoY during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America where WISH temporarily de-emphasized advertising and customer acquisition as the company worked through logistics challenges it faced earlier in the year." Undeterred, the Company also reported strong future demand, providing 1Q21 sales guidance of $735 to $750 million, representing year-over-year growth of 67% to 70%.

74.    The media was quick to analyze the Company's announcement. For example, in "Wish Revenue Beats Estimates, Worries Linger About Growth," published on Bloomberg, the author noted how investors were focusing "on the decline in the website's users," evidenced by the fact that ContextLogic's

stock retreated after "WISH [disclosed it] had 104 million MAU in the fourth quarter, down 10% from the same period a year earlier." In addition, the article republished Defendant Bahri's admission that "delivery times that stretched out longer than two months in some cases made the customer experience so bad the company pulled back ads in India, Brazil, the Philippines and other countries."

75.    On this news, ContextLogic's stock declined more than 10%, falling from $17.77 per share on March 5, 2021, to close at $15.94 per share on March 8, 2021.

76.    Then, on May 12, 2021, ContextLogic announced its 1Q21 financial results for the interim period ended March 31, 2021. Again, ContextLogic's MAUs declined, this time by an additional 7% to just 101 million. Likewise, the Company's forward sales guidance fell short, with its 2Q21 revenue guidance of just $715 million to $730 million coming in significantly below the guidance of $735 to $750 million provided for 1Q21. 70. On this news, ContextLogic's stock cratered more than 29%, falling from $11.47 per share on May 12, 2021, to close at $8.11 per share on May 13, 2021.

77.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of ContextLogic's securities, Plaintiff and other Class members have suffered significant losses and damages.

**LOSS CAUSATION AND ECONOMIC LOSS**

78.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about ContextLogic's misconduct and its lack of operational and financial controls was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in ContextLogic's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock

price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

79.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of ContextLogic's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing ContextLogic's securities to be artificially inflated.   Plaintiff and other Class members purchased ContextLogic's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

**SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS**

80.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants caused ContextLogic to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act. Their conduct with respect to ContextLogic's statements was intentionally misleading and/or reckless with regard to the risk of investors being misled.

81.     For the reasons stated above, the factual allegations strongly support an inference of scienter on the part of Defendants.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

82.     At all relevant times, the market for ContextLogic securities was an efficient  market for the following reasons, among others:

a)   ContextLogic securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b)   During the Class Period, ContextLogic securities were actively traded, demonstrating

1    a strong presumption of an efficient market;

2    c)  As a regulated issuer, ContextLogic filed with the SEC periodic public reports during

3       the Class Period;

4    d)  ContextLogic regularly communicated with public investors via established market

5       communication mechanisms;

6    e)  ContextLogic was followed by securities analysts employed by major brokerage firms

7       who wrote reports that were distributed to the sales force and certain customers of

8       brokerage firms during the Class Period. Each of these reports was publicly available

9       and entered the public marketplace; and

10   f)  Unexpected material news about ContextLogic was rapidly reflected in and

11      incorporated into the Company's stock price during the Class Period.

12   83.   As a result of the foregoing, the market for ContextLogic securities promptly digested

13  current information regarding ContextLogic from all publicly available sources and reflected such

14  information in ContextLogic's stock price.  Under these circumstances, all purchasers of ContextLogic

15  securities during the Class Period suffered similar injury through their purchase of ContextLogic's

16  securities at artificially inflated prices, and a presumption of reliance applies.

17   84.   Alternatively, reliance need not be proven in this action because the action involves

18  omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant

19  to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

20  128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor

21  might have considered the omitted information important in deciding whether to buy or sell the subject

22  security. Here, the facts withheld are material because an investor would have considered the Company's

23  true net losses and adequacy of internal controls over financial reporting when deciding whether to

24  purchase and/or sell stock in ContextLogic.

25   **NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

26   85.   The statutory safe harbor provided for forward-looking statements under certain

27  circumstances does not apply to any of the material misrepresentations and omissions alleged in this

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Complaint.

86.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

87.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of ContextLogic who knew that the "forward-looking statement" was false.    Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring this action on behalf of all individuals and entities who purchased or otherwise acquired who (i) purchased or otherwise acquired securities of ContextLogic., and/or sold put options of ContextLogic during the period from December 16, 2020 and May 12, 2021, inclusive; and/or (ii) all persons who purchased ContextLogic securities pursuant and/or traceable to the Company's initial public offering conducted on or about December 16, 2020, both dates inclusive, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

89.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ContextLogic securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can be

ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ContextLogic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 30, 2021, ContextLogic had 505,000,000 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

90.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

91.    Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

92.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)  whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

b)  whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

c)  whether the price of ContextLogic securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

d)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<b>COUNT I</b>

<i>Violation of Section 11 of the Securities Act Against Defendant ContextLogic, the IPO Defendants and the Underwriter Defendants</i>

94.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

95.    This Count is asserted by Plaintiff on behalf of themselves and the Class against Defendant ContextLogic, the IPO Defendants and the Underwriter Defendants and is based upon Section 11 of the Securities Act, 15 U.S.C. § 77k.

96.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

97.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

98.    By reason of the conduct herein alleged, each defendant violated §11 of the Securities Act.

99.    Plaintiff and the Class have sustained damages. The value of the Company's common stock has declined substantially subsequent to and due to defendants' violations.

100.    At the time of their purchases of the Company's common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the fact upon which this Complaint is based to the time that plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff commenced this action.

101.    By reason of the foregoing, Plaintiff and the other members of the Class are entitled to

damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the relevant Defendants and each of them, jointly and severally.

**COUNT II**

*Violation of Section 15 of the Securities Act Against the IPO Defendants*

102.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein. This Count is brought pursuant to §15 of the Securities Act against the IPO Defendants.

103.    The IPO Defendants each were control persons of the Company by virtue of their positions as directors and/or senior officers of the Company.

104.    The IPO Defendants were each culpable participants in the violation of §11 of the Securities Act, alleged in Count I above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the Acquisition to be successfully completed.

105.    None of the IPO Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus and Registration Statement were accurate complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

106.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Prospectus and Registration Statement and within three years after the Company's securities were sold to the Class in connection with the Registration Statement. It is therefore timely.

107.    By reason of the above conduct, for which the Company's is primarily liable, as set forth above, the IPO Defendants are jointly and severally liable with and to the same extent as the Company's pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

**COUNT III**

*Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendant ContextLogic and the Officers Defendants*

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

1   herein.

2       109.    During the Class Period, Defendants carried out a plan, scheme and course of conduct

3   which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including

4   Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the

5   Class to purchase ContextLogic securities at artificially inflated prices. In furtherance of this unlawful

6   scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

7       110.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

8   statements of material fact and/or omitted to state material facts necessary to make the statements not

9   misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit

10  upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for

11  ContextLogic securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

12  thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct

13  charged herein or as controlling persons as alleged below.

14      111.    Defendants, individually and in concert, directly and indirectly, by the use, means or

15  instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

16  course of conduct to conceal adverse material information about the business, operations and future

17  prospects of ContextLogic as specified herein.

18      112.    These Defendants employed devices, schemes, and artifices to defraud while in possession

19  of material adverse non-public information, and engaged in acts, practices, and a course of conduct as

20  alleged herein in an effort to assure investors of ContextLogic's value and performance and continued

21  substantial growth, which included the making of, or participation in the making of, untrue statements of

22  material facts and omitting to state material facts necessary in order to make the statements made about

23  ContextLogic and its business operations and future prospects in the light of the circumstances under

24  which they were made, not misleading, as set forth more particularly herein, and engaged in transactions,

25  practices and a course of business that operated as a fraud and deceit upon the purchasers of ContextLogic

26  securities during the Class Period.

27      113.    Individual Defendants' primary liability, and controlling person liability, arises from the

following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

114.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ContextLogic's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ContextLogic's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of ContextLogic's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period,

Plaintiff and the other members of the Class acquired ContextLogic's securities during the Class Period at artificially high prices and were or will be damaged thereby.

116. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding ContextLogic's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ContextLogic securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

117. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

118. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

119. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**COUNT IV**

*Violation of Section 20(a) of the Exchange Act Against the Officer Defendants*

120. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121. Jurich and Komin acted as controlling persons of ContextLogic within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Jurich and Komin had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Jurich and Komin were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

122.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123.    As set forth above, ContextLogic, Jurich and Komin each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

124.    By virtue of their positions as controlling persons, Jurich and Komin are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

125.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

126.    WHEREFORE, Plaintiff prays for relief and judgment as follows:

   a)   Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

   b)   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

   d)   Granting extraordinary equitable and/or injunctive relief as permitted by law; and

   e)   Such other and further relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

DATED: July 14, 2021                    Respectfully submitted,


                                        **LEVI & KORSINSKY LLP**

                                        */s/ Adam M. Apton*

                                        Adam M. Apton (State Bar No. 316506)
                                        Email: aapton@zlk.com
                                        388 Market Street, Suite 1300
                                        San Francisco, CA 94111
                                        Telephone: 415-373-1671
                                        Facsimile: 212-363-7171

                                        **LEVI & KORSINSKY LLP**

                                        Nicolas I. Porritt (*pro hac vice* forthcoming)
                                        Email: nporritt@zlk.com
                                        1101 30th Street NW, Suite 115
                                        Washington, D.C. 20007
                                        Tel : 202-524-4290

                                        *Attorneys for Plaintiff Phillip Lam*

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

SUMMARY OF PLEADING
CASE NO.